(No. 38832.—

MILDRED GIBBONS *et al.,* Appellees, *vs.* THE CITY OF CHICAGO, Appellant.

*Opinion filed Jan. 25, 1966.—Rehearing denied March 23, 1966.*

RAYMOND F. SIMON, Corporation Counsel, of Chicago, (SYDNEY R. DREBIN and ALLEN HARTMAN, Assistants Corporation Counsel, of counsel,) for appellant.

RAYNOR & MITCHELL, NIESTEIN, RICHMAN & HAUS-LINGER, and ARTHUR ABRAHAM, all of Chicago, for appellees.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

The plaintiffs, who are owners or operators of self-service, coin-operated laundries in the city of Chicago, brought this action to enjoin the enforcement of the city's ordinance relating to "Self-service Coin-operated Laundry Establishments" upon the ground that the ordinance violates the constitutions of the United States and of the State of Illinois. A temporary injunction restraining the enforcement of the ordinance was issued and the case was referred to a master in chancery. Pending final determination, the plaintiffs were ordered to deposit the fees required by the ordinance with the clerk of the court. Funds in excess of $200,000 were so deposited.

The ordinance became effective September 1, 1961, and the present action was commenced shortly thereafter. The ordinance requires that an attendant be present in every self-service, coin-operated laundry establishment between the hours of 6:00 P.M. and 11:30 P.M., and it provides that no "coin-operated self-service laundry, now or hereafter established, shall be operated between the hours of 11:30 P.M. and 6:30 A.M." The annual license fee is fixed

at \$150 per establishment, plus \$5 per machine in excess of 15 machines. The ordinance requires that each attendant obtain, from the division marshal in charge of the bureau of fire prevention and the commissioner of health, a "certificate of fitness" issued in accordance with standards set out in the ordinance. As originally enacted it required that any person establishing such a laundry submit, for the approval of the commissioner of buildings, a complete set of plans and specifications of the building containing the proposed laundry, and also a complete floor plan of the proposed laundry.

Lengthy hearings were conducted before the master, who found that the basic provisions of the ordinance—the compulsory closing requirement and the provision that required an attendant during certain hours—were valid. He also found, however, that the provision concerning the issuance of certificates of fitness to attendants conferred arbitrary power upon the division fire marshals and the commissioner of health, and that the provision requiring submission of plans was unreasonable insofar as it required an applicant to furnish plans for the entire building in which the laundromat is located.

After the master made his report, the city council amended the ordinance in an attempt to meet his objections, but the trial judge refused to consider these amendments when they were offered in evidence before the decree was entered. His decree held that the ordinance "gives the Division Fire Marshal and the Commissioner of Health uncontrolled and arbitrary discretion whether or not to issue such a Certificate" of fitness, and that the provision requiring the submission of plans and specifications for the entire building, "is an unreasonable burden on the prospec-tive owner," and that both of these provisions were unconstitutional. He also considered that the provision requiring an attendant during specified hours was "dependent" on the standards for qualification of an attendant, and so held that

provision invalid also. The decree directed the clerk to return the funds on deposit to the plaintiffs.

We consider first the propriety of the trial judge's refusal to admit in evidence and consider the amendments to the ordinance, and the consequences of that refusal. To justify the action of the trial judge the plaintiffs rely upon *Trzebiatowski* v. *Jerome,* 24 Ill.2d 24, and other cases which hold that "[T]he full hearing required by due process of law contemplates that all of the evidence should be submitted before a single judge, master or other tribunal which could see the witnesses, weigh their testimony and determine their credibility." (*People ex rel. Reiter* v. *Lupe,* 405 Ill. 66, 71.) But this doctrine relates to testimonial and other evidentiary matters as to which the observations of the trier of the fact are significant, and not when the new matter sought to be put before the court is a change in the governing law.

While we hold, therefore, that the trial court erred in refusing to consider the ordinance as it existed when the case was decided, it does not follow, as the city suggests, that the provisions of the ordinance as it was originally enacted had become moot. A substantial sum, representing license fees under the original ordinance, had been deposited in accordance with the order of the court, and the disposition of those funds depended on the validity of that ordinance. The voluminous testimony related to all of the provisions of the ordinance. Both parties have argued the validity of the ordinance as amended, and we shall consider its validity, both as it now exists and in its original form.

Among the relevant powers delegated to municipalities is the power to "regulate the use and construction of * * * laundries, * * *" (Ill. Rev. Stat. 1965, chap. 24, par. 11—42—8), and the authority of the city to enact a licensing ordinance is not questioned. The main thrust of the plaintiffs' challenge to the validity of this ordinance is directed at its two principal provisions: first, the require-

ment that an attendant be present at all self-service, coin-operated laundries between the hours of 6:00 P.M. and 11:30 P.M., and second, the provision which prohibits the operation of coin-operated, self-service laundries between the hours of 11:30 P.M. and 6:30 A.M. It is contended that neither of these provisions bears any reasonable relation to public health, safety or welfare.

The record shows that there are about 600 self-service, coin-operated laundry establishments in the city of Chicago. Approximately 90 per cent of them do not have an attendant in regular service during any portion of the day. The operation of the washers and dryers is similar to those found in noncommercial settings, and there was testimony that for this reason there is no need for an attendant to give special instructions. There was also testimony that persons who use the machines do not like to have anyone see their dirty laundry. Of the forty owners or operators who testified, over three-fourths hired part-time porters and contracted for maintenance work, and so have not found it necessary to employ an attendant for any part of the day. A fair summary of the testimony is that those engaged in the business consider an attendant to be more of a detriment than an asset, because the business function he would serve is already adequately performed, and because the customers would be annoyed by the possibility of an attendant's examination of dirty clothing. It appears that the busiest period of the day for these laundries is usually between 6:00 P.M. and 12:00 P.M., and, although there are no very accurate figures, it also appears that about 20 per cent of the business of those laundries which remain open 24 hours a day is done between the hours of midnight and 7:00 A.M. Most of the customers are women.

There appear to be few instances of either fires or personal injuries due to negligence or accident in these establishments, and there has been no difference between attended and unattended laundries in the rates for insurance

against fire and personal injury risks. (See, however, *Schacht* v. *City of New York,* 243 N.Y.S. 2d 272, 279, (1963).) A representative of the Chicago Fire Department testified that there had been fires relating to washers or dryers in such establishments, all of which were contained in the machines. He testified, however, to the great value an attendant would have in curtailing the risks of fire. The main danger of fire appears to derive from failure to remove lint from the dryers or from placing improper materials into them. The main risks of personal injury derive from the fact that some of the machines continue spinning when they are opened while in use. There was also testimony by a manufacturer of driers that he had heard that children climbed inside the machines to see who could stay longest. Some washers have overflowed on occasion, with the consequent risk of injury and, if a wire is frayed or cut, of electrocution. But there was no testimony that any incidents of the latter sort had occurred. Laundry operators testified that there were few overflows, and that the risks relating to maintenance of the machines were cared for adequately by existing maintenance practices.

If the water is maintained at the proper temperature, a sterilizing effect is achieved. But there was testimony that disease might be communicated if the proper temperature is not maintained or an overload of clothing is placed in the machines. Although the weights of the load limits are announced on the machines, instances of overloading undoubtedly occur. The risks involved here are constant, and the requirement of an attendant during peak business hours appears both reasonably related to those risks and reasonably adapted to curtail them. It seems fair to summarize that attendants during the peak business hours of 6:00 P.M. to 11:30 P.M. would perform few positive business functions other than checking equipment, preventing overloads or the insertion of improper materials, cleaning the premises and changing money if there is no automatic changer, most

of which functions are currently performed to the satisfaction of the operators. But attendants would serve some functions not presently served, for their presence on the premises during the peak business hours, at night, would afford constant assistance and would tend to assure proper use of the machines during those hours.

We need not determine whether the matters thus far discussed, which relate to considerations of public health and the risks of fire and personal injuries, would be sufficient, standing alone, to justify the requirement that an attendant be present when the establishment is open at night. For we are of the opinion that when they are considered in conjunction with considerations related to the deterrence of crime and criminal activity, both the requirement of an attendant and the compulsory closing provision of the ordinance are clearly justified.

Several representatives of the Chicago Police Department expressed the opinion, based upon their experience, training, background and knowledge, that the presence of an attendant between the hours of 6:00 P.M. and 11:30 P.M. would have a deterrent effect on crimes related to self-service, coin-operated laundries. Reports compiled by the Chicago Police Department show that the peak period of reported crime for this type of laundry increases sharply about 5:00 P.M.., reaches a peak sometime after midnight, and decreases sharply after 4:30 A.M. This period correlates with that during which the presence of an attendant and compulsory closing are required under the ordinance. There was testimony of numerous incidents of crime of varying degrees of seriousness in connection with these laundries. Police officers testified that any warm, well-lighted place would contribute to certain types of crime, but that open, unattended laundries are almost unique in their attractiveness. It was the opinion of the police officers who testified that the incidence of larcenies of coins from the machines would decrease significantly as a result of the

attendant and closing requirements. Certain types of prevalent sex crimes, such as indecent liberties and exhibitionism, would also decrease and the danger of rape or similar violent sexual assault on unescorted women would be reduced.

Over one-half of all police activity in regard to self-service laundries relates to the congregation of juveniles at night. Plaintiffs make much of the fact that this conduct is not in itself criminal. But it is nonetheless a large and important area of legitimate police activity.

Plaintiffs also argue that the requirement of an attendant will increase the incidence of certain types of crimes, such as sex exhibitionism, by guaranteeing a spectator, and that the closing requirement will increase the incidence of burglary. But the choice of deterrence of one type of crime at the expense of an increase in another involves a typical legislative judgment. We are satisfied upon this record that the attendant and compulsory closing provisions of the ordinance are neither arbitrary nor unreasonable, (see *Kaukas* v. *City of Chicago*, 27 Ill.2d 197, 201-203; *Queenside Hills Realty Co.* v. *Saxl*, 328 U.S. 80, 90 L. ed. 1096, 66 S. Ct. 850,) and that they do not violate the constitution of Illinois or the constitution of the United States.

The trial court's determination that the entire ordinance was invalid rested upon his conclusion that the requirement that an attendant secure a certificate of fitness "gives the Division Fire Marshal and the Commissioner of Health uncontrolled and arbitrary discretion whether or not to issue such a Certificate, and is invalid, excessive, arbitrary, unnecessary, capricious and unreasonable  *  *  *." We do not agree with this conclusion. As originally enacted the pertinent section read: "No person shall act as an attendant in any such laundry establishment, unless he shall be the holder of a certificate of fitness issued by the division marshal in charge of the bureau of fire prevention and the commissioner of health. Before the issuance of any such certificate, the division marshal in charge of the bureau

of fire prevention, and the commissioner of health, shall examine the applicant as to his qualification to fill such position. To receive a certificate of fitness, the applicant must: (a) be a citizen of the United States; (b) be of legal age, temperate habits and good moral character; (c) be able to speak and understand the English language; (d) produce evidence of his employment or occupation and residence for the previous 2 years; (e) be familiar with the operation of the machines in the establishment; and (f) be familiar with the risks incident to the operation of the machines, and capable to taking the necessary precautions."

Plaintiffs do not challenge the reasonableness and appropriateness of these standards. Rather they argue that even if an applicant satisfies the standards set out in the ordinance, the fire marshal and health commissioner nevertheless have discretion under the ordinance to deny a certificate. The language of the ordinance does not explicitly grant any such arbitrary discretion to these officers, and we see no reason to read such a provision into it. As we pointed out in *Pliakos* v. *Liquor Control Com.* 11 Ill.2d 456, 459, "* * * the courts start with the assumption that the legislature intended to enact an effective law, and the legislature is not to be presumed to have done a vain thing in the enactment of a statute." The cases plaintiffs cite are inapposite. Insofar as *City of Rockford* v. *Hey,* 366 Ill. 526, 534-35, held invalid an ordinance which provided that the commissioner of health should recommend the issuance of a license "if *satisfied* with the condition of the premises," it was in effect overruled by *Toplis and Harding, Inc.* v. *Murphy,* 384 Ill. 463, 468-73. (See also, *City of Chicago,* v. *Ben Alpert, Inc.* 368 Ill. 282, 287-88; *City of Chicago* v. *The R. & X. Restaurant,* 369 Ill. 65, 71-73.) In *Dean Milk Co.* v. *City of Aurora,* 404 Ill. 331, 336, the ordinance in question did not specify the circumstances under which approval of an application for a license was to be given, "but purports to vest in the designated officers wide discretion to

give or withhold their approval." And in *People ex rel. Schimpff* v. *Norvell,* 368 Ill. 325, 327, the ordinance prescribed "no conditions or terms upon which the commissioner of buildings is to determine what shall be an 'officially approved place.'"

The trial judge also held invalid the provision of the original ordinance which required an applicant for a license to submit for inspection and approval the plans and specifications for the entire building in which the proposed laundry was to be housed. This requirement was eliminated by the amendments to the ordinance. We do not find it necessary to pass on the validity of the original provision, for we are of the opinion that even if it was invalid, it was separable. The reasonableness of the requirement that plans for the laundromat itself be submitted is not disputed. The ordinance was capable of being fully executed without the disputed provision, and we can not say that the city council would not have adopted the ordinance without it. *People ex rel. Adamowski* v. *Wilson,* 20 Ill.2d 568, 582.

Plaintiffs also attack the annual license fee of $150 for "each establishment having 15 or less self-service coin-operated machines, and $5 for each machine in excess of 15 machines maintained upon the premises," as well as the annual fee of $12 for an attendant's certificate of fitness. We find no evidence in the record to show that these fees are not reasonably related to the burdens placed upon the city because of the regulatory provisions of the ordinance. And in the absence of proof to the contrary, it is presumed that a reasonable relationship exists between the required fee and costs of regulation. *City of Chicago* v. *Schall,* 2 Ill.2d 90, 91.

The ordinance, as originally enacted, and as amended, is not invalid. The judgment of the circuit court is therefore reversed, and the cause is remanded to that court for the entry of a decree in accordance with this opinion.

*Reversed and remanded, with directions.*